Allen, J.
The comptroller was indisputably right in his conclusion, that the act chapter 700 of the Laws of 1872, authorizing, subject to the approval of the electors upon a popular vote at the next general election, the creation of a debt for the purposes named therein, was void, and in taking action as if the act had not been passed.
By section 12, of article 7, óf the State Constitution, no debt can be contracted by or on behalf of the State, except to an amount not exceeding $1,000,000, to meet deficits in revenues, or for expenses not provided for, or to repel invasion, etc., unless authorized by a law for some single work or object to be distinctly specified therein, and such law cannot take effect until by a submission to the people at a general election it shall have received a majority of all the votes cast for and against it. The same section prohibits the submission of such law at any general election, when any other law, or any bill, or any amendment to the Constitution shall be submitted to be voted for or against. The prohibition is absolute; and as there was an amendment to the Constitution submitted at the same general election (1872) at which the law was, by its terms, to be and was. submitted, it follows that the submission was a nullity and the attempt to create a debt necessarily failed, *559 and the law, impossible of execution under the Constitution, was absolutely void.
It was upon this ground that the comptroller advised the boards of supervisors of the several counties that the law for the creation of the debt was void, and required them to levy the tax directed by 'chapter 134 of the Laws of the same session of the legislature, as a provisional substitute for the contemplated loan. But the law itself was upon its face, and by its terms, a palpable and gross violation of one of the most essential and vital provisions of the Constitution. The framers of that Constitution, with ripe experience of the past and a wise forecast as to the future, made ample provision for the protection and preservation of the public credit, sure guarantees for the public creditors, and efficient guards against the creation of a public debt withput the intelligent, deliberate assent of the people.
Ho law authorizing a debt to be contracted can take effect until assented to by the people, and but one law for that purpose can be submitted at the same general election or within three months of its passage, and the debt to be created must be for some single work or object to be distinctly specified in the law. (Const., supra.)
Ho more stringent or judicious provision could be devised to secure to the electors the information necessary to an intelligent expression of their will, and to enable them to act upon the merits of the proposition unembarrassed and undisturbed by interests and influences other than those connected with the character and importance of the single work or object for which it should be- proposed to contract the debt.
While nothing short of an absolute prohibition against the creation of a public debt could better guard the people against an unwise and improvident exercise of the ptiwer than would the Constitution, adhered to and obeyed in its spirit, it is hazarding but little to say that a law could hardly be passed which could be more antagonistic to the spirit and violative of the letter as well as spirit of the Constitution than is the law under consideration in all its essential parts.
*560 The first section appropriates over $6,600,000 in different sums to some twenty different purposes, beside the legion that may be embraced in the last paragraph, appropriating over $4,000,000 to the very general but indefinite purpose of paying “ the present acknowledged deficiency and the estimated liabilities of the general fund up to the 30th day of September, 1872.” The appropriations are, by the terms of the act,' made to appear as new appropriations, not reappropriations of moneys which had lapsed; nor does the act purport to be an act to provide means for the payment of appropriations before then made.
Some of the provisions of this act are probably sufficient in form as expressing the sum appropriated and the object to which the money is to be applied within section 8 of article 7 of the Constitution. But it is not true as to all. As to some, the object of the appropriation can neither be spelled out or guessed at. The first three items are examples of indefiniteness as to object which would be fatal to the appropriations. They are appropriations severally of specific sums for deficiencies in the appropriations made by chapters 767 and 768 of the Laws of 1870, and chapter 930 of the Laws of 1871.
Each of the acts named imposes a tax and makes appropriations from the avails for very many specific, distinct purposes and objects. Two of them are the general appropriation bills for the different expenditures ordinarily provided for under the name of new work and extraordinary repairs upon the State canals, appropriating given sums to each distinct work, and the other makes distinct appropriations of different sums for the payment of awards for canal damages, made in different years, and another sum for the payment of deficiencies in the appropriation bill for new work and extraordinary repairs on the canals in 1869.
It is impossible to divine from the law of 1872 which of the many appropriations in the acts referred to were deficient, or to which of the several objects named in these acts the appropriations were to be applied.
*561 The appropriation of over $4,000,000 is still more defective. It is “ for the present acknowledged deficiency, and the estimated liabilities of the general fund up to the 30th day of September, 1872, for the payment of which no appropriations have been made, but which such indebtedness has been incurred and such liabilities created according to the report of the late comptroller, transmitted to the legislature January 2d, 1872.”
The comptroller’s report, if accessible, may distinctly specify the debts and liabilities “ acknowledged and estimated,” to whom payable, and for what contracted, but this is not a compliance with the important requirement of the Constitution, that the object as well as the amount of the appropriation shall be distinctly specified in the act.
But passing to the second section of the act, which authorizes the creation of the debt, it will be found to come far short of the requirements of the Constitution.
It is enacted by that section that to provide the means of paying the appropriation made by the first section, declared to be “ for the canals,” and “to pay the floating indebtedness of the State, and the estimated liabilities of the State” not yet provided for by law, a debt is authorized. It is true the act makes a show of respect for the Constitution by writing “ appropriation ” in the singular number, and declaring that the debt shall be for the single object of raising the money to pay the “ appropriation herein named.” But the Constitution cannot thus be nullified. The appropriations are in fact many, and their objects many and diverse, and they cannot be reduced to one, and the objects and works made a unit by the mere dash of a pen or the construction of a sentence. ¡Neither is the object of the debt made single by declaring it to be for the payment of the aggregate of all the sums of money appropriated by the act.
The “ work or object ” contemplated by the Constitution is the public work or object to be accomplished by the expenditure of the money to be borrowed. If an appropriation had been made for a single work or object, a debt might per *562 haps he created for the payment of that one appropriation, upon the principle that that is certain which can be made certain ; and by reference to the law making the appropriation the object or work for which the debt was to be contracted would be ascertained. Still, this would not be the best or a desirable form of legislation, and would be of doubtful validity.
The design of the Constitution was that the specific purpose of the debt should be specified in the act, that the legislature and the people," who were to vote upon it, could read it there; and a departure from the letter of the provision may frustrate its intent." It is true, here the appropriations and the authority for the debt are in the same act; so that the law is not obnoxious to the objection that would exist if they were in separate acts. But the difficulty remains that, notwithstanding the form of the second section, the “ work or object” for which the debt is authorized is not a single work or object; neither are the objects defined or capable of being ascertained from the act itself.
The act appropriates, in different sums varying from $2,500 to over $4,000,000, respectively, an aggregate amount of over $6,000,000; but each appropriation is for a different work or object. The Constitution would be of little value as a restraint upon the debt-creating power if it could be evaded by bringing together in one law distinct appropriations of different amounts, for a canal in one part of the State, in aid of a railroad in another, building a lunatic asylum in another, and a State prison and a normal school building in still other parts; and then a debt could be authorized for the single object of raising the money to pay the “said appropriation.” The act is clearly violative of the Constitution, so far as it authorizes the creation of a debt; and this is the ground upon which it should be declared void, as the ground which best preserves the Constitution in its integrity, and does not make the validity of the law to depend on the accidental submission of a constitutional amendment to the people at the same time.
*563 But the whole theory of the act is entirely subversive of the Constitution. It proceeds upon the assumption that a State debt may be created and exist outside of the Constitution, either by act of the legislature, or the acts of the administrative or executive officers and agents of the State; that, notwithstanding the stringent provisions of the organic law of the State, expenses may be authorized and liabilities incurred in advance and in excess of money provided, which must be met either by direct taxation or by borrowing. If no debt existed, there was no necessity for borrowing money. The future expenditures of the State were within the control of the legislature, and could not, within the Constitution, exceed the ■ means provided, except as a debt might be created, not exceeding $1,000,000 in amount, to meet deficits or failures in revenues, or for expenses not provided for. To this extent a temporary loan could be made. (Const., art. 7, § 10.) A debt of $6,000,000, or liabilities to that amount, and resting as a burden upon the people, resulting from the acts of the legislature and the agents and officers of the State, is an impossibility, for the reason that it is absolutely prohibited ; and any attempt to create such debt or incur such liability is a nullity. There can be no floating debt under the present Constitution; neither can a debt be created by making appropriations, and directing expenditures in excess of taxes levied and means provided. Could the Constitution and the intent of the people, in adopting it, be thus easily circumvented and frustrated, that instrument would be of little value. The fallacy that there is or can be a floating debt, or a debt created in the discretion of the legislature by excessive appropriations, and scanty tax levies, lies at the foundation of this act, and all the kindred schemes for borrowing money under the pretence of relieving the treasury and preserving the credit of the State. Neither the legislature nor the officers and agents of the State, or all combined, can create a debt or incur an obligation for or in behalf of the State, except to the amount and in the manner provided for in the Constitution.
*564 The objects and purposes to which the moneys in the treasury shall be appropriated, or for which taxes shall be levied, are very much, if not entirely, in the discretion of the legislature. The legislature has entire control over the revenues of the State, whether derived from annual taxation or other sources, except as such moneys are pledged or appropriated by the Constitution. Such control is exercised by means of statutes making annual appropriations, that is, by acts declaring to what purposes and in what amounts the moneys of the State shall be applied. The acts of the legislature in making these appropriations are supreme to the limit of the funds and moneys at their disposal, but nullities in excess of that amount. The credit of the State is beyond its control. A pauper dying may, in form, bequeath millions, but his legatees will be none the richer, and those who come after him will be under no obligation to make good his bequests from their earnings. So the legislature can effectually dispose of the moneys of the State from year to year, but appropriations in excess of such moneys impose no liability upon the people or obligations upon successive legislatures to provide the means for their payment. The administrative officers of the State cannot give effect to them either by borrowing money or incurring liabilities in other forms, for the reason that the Constitution stands as an insuperable barrier to any debt to be created by such means. The sinking funds, and the other trust funds of the State, are carefully and effectually preserved by the Constitution, and cannot be diverted from the purposes to which they are pledged. Precedent has sanctioned annual temporary loans from these funds in anticipation of taxes actually levied and in process of collection, to be repaid with interest when the taxes for the fiscal year shall be paid, into the treasury. ISTo harm or loss has or can come from this practice, and it is authorized from year to year by statute. This is the extent to which these funds can be used for the payment of the ordinary appropriations by the legislature. Without the'sanction and the action of subsequent legislatures, appropriations in excess of means provided will be harmless, as they can only *565 be effectual as drafts upon the treasury to the extent of the funds with the treasurer applicable to their payment, and can only burden the people to the extent of the taxes actually imposed. The acts will remain upon the statute books, but will only serve as monuments of the extravagance, recklessness or folly of those by whom they were enacted. Subsequent legislatures can, if the objects of the appropriations are deemed worthy, give effect to them by providing the means and directing their payment, but the discretion and responsibility is with them as if no former appropriations had been made. Ho duty or obligation is devolved upon them by the acts of their predecessors.
If the legislature of 1872 had deemed the appropriations by their predecessors unadvised or improper, they were under no obligation to provide the means for their payment, as no debt or liability rested upon the State in respect to those which were in excess of the means provided. The appropriations of over $2,000,000 in 1871, to charitable institutions, State and private, constituted no debt against the State, and, as there were no means for their payment, might have been ignored in 1872, and could not have been paid but for the sanction of the statutes before us. The mistake of the legislature was in regarding former appropriations as imposing any obligations upon the State, and undertaking, in violation of the Constitution, to provide for the payment of that class of appropriations for which means were not provided. It is not in the power of a legislature to add to the debt of the State by extravagant and excessive appropriations, and at the same time keeping up a show of economy by imposing minimum taxes. The treasury cannot be embarrassed or the people burdened by debt in such form.
As there was no valid law authorizing a debt to be created, there was no valid submission of any question to the people; and this view is decisive of the ingenious position taken by the counsel for the appellant, that it was the popular vote, and not the effect of the vote, that determined the question whether the law imposing the tax should take effect. The *566 law being a nullity, it was as no law in all its parts and provisions.
. The popular vote for and against the debt proposition was in truth no indication of the will of the majority of the electors; and it would be unjust to the intelligence of the people, and their loyalty to the policy as well as the provisions of the Constitution, so to regard it. That class who favored an extension or enlargement of the public debt voted for it, while the great body of those who would have voted otherwise, had there been an act valid in form, legally submitted, refrained from voting, knowing that the act of voting was a farce.
These proceedings are to compel, by the writ of mandamus, the defendants to levy upon the county of Kings its quota of the tax imposed by chapter 734 of the Laws of 1872.
The fifth section of the act, by which the levy of the tax was made to depend upon the popular vote upon the debt proposition of chapter 700, may be regarded as out of the statute. There was no valid law authorizing the creation of the ,debt; and, therefore, that section had no aliment for its support.
The Constitution, prescribing the requisites of a law imposing a tax, is in harmony with the other provisions designed for the protection of the tax-payer. Its terms are precise and unambiguous, leaving no way of escape from a literal compliance with them, and no room for evasion by any lax interpretation. They are so plain they need no interpretation. It declares that “every law which imposes, continues or revives a tax shall distinctly state the tax, and the object to which it is to be applied; and it shall not be sufficient to refer to any other law to fix such tax or object.” (Const., art. 7, § 13.)
The tax would have been well specified in amount but for a clause, found for the first time in a tax law. A tax of three and one-half mills upon the dollar of the assessed value of the real and personal property in the State is definite and certain. But the legislature have qualified the same and *567 authorized the tax to be reduced if it should be found, upon . a corrected estimate, that a lesser tax would give the necessary means. The law imposes a tax of three and a half mills per dollar, or so much thereof as may be necessary, to provide for the payment, etc. This is not a specific and distinct statement of the tax to be levied. It is simply a statement of the maximum tax to be levied, leaving it to the discretion of the administrative officers of the State to levy such tax as they shall find necessary up to the limit named. The legislature cannot, under the Constitution, thus delegate the power of taxation. They must determine the amount necessary and adequate, and declare the amount to be levied absolutely. If this form of enactment is allowable, a law authorizing a tax of fifty per cent of the assessed value of the taxable property of the State, or so much thereof as might be necessary, would be valid, and the whole legislative taxing power delegated to the other departments of the State government. The law is invalid as not stating the tax imposed. But it is still more defective in not stating in the body of the act, and without reference to any other law, the object of the tax. After what has been said as to the appropriations by chapter 730, but little need be said in respect to the defects of this law. They are too patent to be elucidated by argument or illustration. The Constitution says that neither the tax nor the object shall be fixed by reference to any other law. The object of the tax imposed by this law is fixed only by references to chapter 700 of the Laws of the .same session. It is “ to provide for the payment of the canal and general fund deficiencies directed to be paid by the act, chapter 700 of the Laws of 1872.” The provision is for certain deficiencies mentioned in the act referred to. If the act to which reference is made be resorted to, reference to still other acts, and to a report of the comptroller to the legislature, is necessary to ascertain the particular deficiencies intended to be provided for, and the object of the tax. There is no attempt, as in the act authorizing the debt, to preserve the semblance of a compliance with the Constitution, by *568 incorporating into the enactment a phraseology somewhat resembling that of the Constitution.
The object of the tax is plainly and clearly fixed, or attempted to be fixed, by a reference to other acts and State documents. There is no escape from the conclusion to which this examination leads, and the only safety is in adhering strictly and giving effect* to every part of the Constitution, regulating the appropriation of public moneys, and restraining and regulating taxation and the debt-creating power. The power of taxation can only be exercised within the limits and in the forms prescribed by the Constitution.
There is no dispensing power anywhere, or any rule of construction by which the restriction can be relaxed, or the terms of the power varied or enlarged. The legislation embodied in the two acts under consideration and the policy shadowed forth by them have, I think, no precedent in the legislation of this State, certainly none since the present Constitution was adopted in 1846, and the least that can be said of it is that it was careless and indefensible and ought not to stand.
The Constitution is reasonable in its requirements. There are no serious difficulties in complying with its provisions. The financial scheme of the Constitution of 1846, which grew out of the legislation of 1842, made necessary by the then condition of the State finances and public credit, cannot be departed from without peril to the public interests; and literal and full effect should be given to every provision of article 7, especially those provisions designed to restrict and regulate the legislative powers over the public moneys and credit or the property of the citizens.
While the financial article of the Constitution is stringent in its provisions in limiting and restricting the debt-creating and taxing power, and regulating the appropriation of the public moneys, it is elastic in that it gives ample power to protect the credit of the State and supply the deficiencies of the sinking funds created for the extinguishment of the public debt.
*569 The public creditor is secured by the pledge of certain revenues and the required contribution to the sinking funds created by the instrument, and a destruction of the pledge and an undue diminution of the annual contributions to the sinking funds is prevented by a prohibition against the reduction of the canal tolls, the chief source of revenue, beyond a prescribed limit, and thus the taxable property of the State is effectually relieved from the burden of the debt thus provided for. Ample power is given to the financial officers of the State to provide against casual deficits in the contributions to the sinking funds without resort to taxation or legislation and without increasing the debt. So that any “funding” or formal renewal of the debt is unnecessary, and an adherence to the plain provisions of the Constitution will necessarily extinguish the debt within a brief period.
It is not difficult, and ought not to be regarded as an unreasonable or onerous requirement, to state the “object ” to which an appropriation is to be applied, or the “ single work or object ” for which it is proposed to create a State debt, or the “object” for which a tax is deemed necessary, and to which it is to be applied.
If an acknowledgment by the comptroller of a deficiency, and a statement by him of estimated liabilities, is a sufficient statement of an “object,” either for an appropriation, a debt or a tax for a sum in gross, the framers of the Constitution labored to little effect in devising and enacting the stringent provisions of that instrument. If there were deficiencies to he supplied, and liabilities outstanding for which moneys should be provided, or necessary expenditures to be made in the future, which is probably what was intended by “estimated liabilities,” for which provision should be made by tax or otherwise, they should have been separately and distinctly stated in detail, and not grouped together and provided for in the gross as “ acknowledged and estimated ” by the comptroller to an amount exceeding $4,000,000. But without considering further the general features of the legislation under consideration, it is sufficient to say that if acts *570 as general and indefinite as to object and purpose as these could stand, a very easy way would be opened for the creation of a debt or the imposition of a tax for works and objects entirely undisclosed, and the moneys to be realized from either would be very much at the disposal of the legislature. It would be difficult to say that any application of them was not within the general purposes named in the acts or in some other act or public document to which reference was made.
The act chapter 734, imposing the tax, is clearly void, as violative of section 13, of article 7, of the Constitution, in that it does not specify or state either the amount or object of the tax; and the orders of the General and Special Terms must be reversed and the motion for a mandamus denied.
All concur.
Ordered accordingly.